# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| REV. JEFFREY ALLEN ROWE, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:11-cv-00524-JMS-MJD |
| | ) |
| INDIANA DEPARTMENT OF | ) |
| CORRECTION,[1] ALAN FINNAN, | ) |
| ALBERTA POTTER, CHAPLIN DODD, | ) |
| CHAPLIN ROGERS, DANIEL | ) |
| BODLOVICH, DENNIS DAVIS, | ) |
| BRUCE HEMLING, EDWIN BUSS, | ) |
| HOWARD MORTON, KRISTY | ) |
| RICHARDSON, LARRY FOWLER, | ) |
| L.A. VANNATTA, LISA ASH, | ) |
| MICHELLE PAVESE, STEPHEN HALL, | ) |
| WALTER PERTERSON, WAYNE SCAIFE, | ) |
| WILLIAM WILSON, | ) |
| | ) |
| Defendants. | ) |

## ENTRY DISCUSSING CROSS MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Jeffrey Allen Rowe, currently an inmate at the Wabash Valley Correctional

Facility (Wabash Valley) and self-described associate pastor of the Church of Jesus Christ

Christian (CJCC) (a religion associated with white-supremacist ideology), filed this civil action

while he was incarcerated at the Pendleton Correctional Facility (PCF). In this action Rowe sues

prison officials under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42

---

[1] For the reasons explained later in this Entry and in the interest of clarity, the **Indiana Department of Correction** is now substituted for the individual defendants named in their official capacities as to the RLUIPA claims. *See Will v. Michigan Department of State Police,* 491 U.S. 58 (1989) (suits against state employees in their official capacity are treated as suits against the states themselves). The **clerk is directed to add the Indiana Department of Correction as a defendant** on the docket.

U.S.C. §§ 2000cc to 2000cc–5, and under 42 U.S.C. § 1983, alleging violations of his First Amendment rights. Specifically, Rowe alleges that the defendants interfered with his ability to practice his religion as an adherent and pastor of the CJCC. Rowe labels his religion and himself as white supremacist.

All parties seek resolution of this action through the filing of cross motions for summary judgment. For the reasons explained below, the plaintiff's motion for summary judgment [dkt. 128] is **denied** and the defendants' motion for summary judgment [dkt. 89] is **granted in part and denied in part.**

## I.   Standard of Review

"Summary judgment is appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Westra v. Credit Control of Pinellas,* 409 F.3d 825, 827 (7th Cir. 2005) (quoting Rule 56(c) of the *Federal Rules of Civil Procedure*). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'" *Springer v. Durflinger,* 518 F.3d 479, 483 (7th Cir. 2008)(quoting *Sides v. City of Champaign,* 496 F.3d 820, 826 (7th Cir. 2007).

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" which it believes demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)

(quoting Rule 56(c)). On cross-motions for summary judgment, the Court construes facts and draws inferences "in favor of the party against whom the motion under consideration is made." *Keck Garrett & Associates, Inc. v. Nextel Communications, Inc.*, 517 F.3d 476, 483 (7th Cir. 2008) (quoting *In re United Air Lines, Inc.,* 453 F.3d 463, 468 (7th Cir. 2006)).

## II. The First Amendment and RLUIPA

Rowe raises both First Amendment and RLUIPA claims in this action.

The First Amendment provides, in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. Const. Amend. I. The Free Exercise Clause of the First Amendment prohibits the government from imposing a "substantial burden" on a "central religious belief or practice." *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013). But, "the religious freedom guaranteed by the Free Exercise Clause of the First Amendment does not require religious exemptions from facially neutral laws of general applicability." *Korte v. Sebelius*, 735 F.3d 654, 671 (7th Cir. 2013) (citing *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 883–90 (1990)). Thus, neutral laws of general applicability need only satisfy the basic test for rationality that applies to all laws; if a law incidentally burdens the exercise of religion, the Constitution does not require an exemption. *Id.* (citing *Smith*, 494 U.S. at 878–79, 888–90).[2]

RLUIPA provides greater protections to a prisoner than the First Amendment. RLUIPA

---

2 In *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), the Supreme Court established the test for evaluating the constitutionality of regulations that infringe on prisoners' First Amendment Rights. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349. To determine whether a challenged regulation is valid, this Court will consider four factors: (1) whether the regulation has a logical connection to the legitimate government interests invoked to justify it; (2) whether there are alternative means of exercising the rights that remain open to the inmates; (3) the impact that accommodation of the asserted constitutional rights will have on other inmates, guards, and prison resources; and (4) the presence or absence of ready alternatives that fully accommodate the prisoner's rights at *de minimus* cost to valid penological interests. *See id.* at 350–52 (citing *Turner v. Safley*, 482 U.S. 78, 89–90 (1987)).

prohibits prisons that receive federal funding from substantially burdening an inmate's religious exercise unless the step in question is the least restrictive way to advance a compelling state interest. 42 U.S.C. § 2000cc(a); *see also Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006) (citing *Cutter v. Wilkinson*, 544 U.S. 709 (2005); *Lindell v. McCallum*, 352 F.3d 1107 (7th Cir. 2003)). The First Amendment, by contrast, does not require the accommodation of religious practice: states may enforce neutral rules. *See Borzych*, 439 F.3d at 390 (citing *Employment Division of Oregon,* 494 U.S. 872.

Claims under both the First Amendment and RLUIPA are evaluated under the substantial burden test, which requires the plaintiff to show that the defendants substantially burdened his free exercise rights. *See Patel v. Bureau of Prisons*, 515 F. 3d 807, 814 (8th Cir. 2008) ("[T]he same definition of 'substantial burden' applies under the Free Exercise Clause, RFRA, and RLUIPA."). At a minimum, a substantial burden exists when the government compels a religious person to "perform acts undeniably at odds with fundamental tenets of [his] religious beliefs." *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972). Towards the other end of the spectrum, "a substantial burden on the free exercise of religion … is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs." *Koger v. Bryan,* 523 F.3d 789, 798-99 (7th Cir. 2008) (internal quotation and citation omitted); *see also Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981); *Nelson v. Miller*, 570 F.3d 868, 878 (7th Cir. 2009). In discussing RLUIPA, the Seventh Circuit has held that a law, regulation, or other governmental command substantially burdens religious exercise if it "bears direct, primary, and fundamental responsibility for rendering [a] religious exercise . . . effectively impracticable." *Korte*, 735 F.3d at 683 (citing *Civil Liberties for Urban Believers v.*

*City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003)).

### III. Scope of Rowe's Claims

The claims set forth below are understood to be the only remaining claims pursued by Rowe. A host of other claims have been voluntarily dismissed. See dkts. 36; 128 at p. 29; and 90 at fn. 1. Any claim not specifically mentioned in this Entry is understood to be voluntarily dismissed by Rowe. Dkt. 128 at p. 82 ("Any other claims Rowe has, that he has not already voluntarily dismissed, or argued herein for summary judgment in his favor, Rowe hereby voluntarily dismisses."). In addition, the scope of Rowe's claims is necessarily limited by the relief sought.

First, Rowe seeks money damages. As explained in the Entry of August 29, 2012, claims for money damages under RLUIPA are dismissed. *See Sossamon v. Texas*, 131 S.Ct. 1651 (2011) (money damages are not available in suits against states under the RLUIPA). The only relief available to Rowe if he prevails on his RLUIPA claims is for injunctive relief. Thus the claims for money damages are necessarily against the individual defendants pursuant to 42 U.S.C. § 1983 for allegedly violating Rowe's First Amendment rights.

Second, Rowe seeks injunctive relief. For the reasons explained above, RLUIPA provides greater protection to Rowe as a prisoner than does the First Amendment. Thus for practical reasons, Rowe's claims for injunctive relief are evaluated under RLUIPA and the First Amendment claims for injunctive relief are disregarded. In addition, the defendants note that many of Rowe's claims are based on circumstances which occurred at PCF and are specific to that facility. For example, the way in which defendant Walter Peterson reviewed Rowe's mail is specific to PCF. As a result of Rowe's transfer such claims for injunctive relief are now moot. As Rowe correctly notes, however, claims for injunctive relief against a system-wide policy or practice are not moot when a prisoner is transferred to another prison. See dkt. 129 at p. 13. Such

claims for injunctive relief are necessarily against the IDOC.[3]

Rowe seeks an order prohibiting the application of six IDOC policies. See dkt. 128 at p. 32. All other RLUIPA claims are understood to have been voluntarily dismissed. See specifically dkt. 128 at pp. 33 and 36 (voluntarily dismissing claim that omission of a time limit for review of correspondence violates RLUIPA). Rowe claims the following policies violate RLUIPA:

1.      The Zero Tolerance Policy on Security Threat Groups. Identified by Rowe as IDOC Policy No. 02-03-105. See dkt. 127-1 at p. 25, ¶¶ 48-50. (Attached to Entry as Exhibit A).

2.      The visitation policy prohibiting current prisoners from receiving visits from ex-prisoners who are not immediate family of the current prisoner. Identified by Rowe as IDOC Policy No. 02-01-102. (Attached to Entry as Exhibit B).

3.      The property policy limiting prisoners to only possessing one authoritative religious text book and twenty additional books (unless in an approved religious study course). Identified by Rowe as Policy No. 02-01-101. See dkt. 127-1 at 31 ¶ 118. (The Court was unable to locate a copy of this policy in the record or online).

4.      The correspondence policy prohibiting offender-to-offender mail when one of the prisoners is on any type of segregation unit. Identified by Rowe as Policy No. 02-01-103. See dkt. 127-1 at 33 ¶¶ 130-131. (The relevant portion of this policy is attached to this Entry as Exhibit C).

5.      The correspondence policy which Rowe describes as prohibiting "item censorship" of religious publications/correspondences. Identified by Rowe as Policy No. 02-01-103. See dkt. 127-1 at p. 38, ¶ 184. (The relevant portion of this policy is attached to this Entry as Exhibit D).

6.      The department-wide ban on the swastika. Dkt. 128 at p. 36, see also Exhibit E.

---

[3]RLUIPA does not authorize any kind of relief against public employees. *See Vinning-El v. Evans,* 657 F.3d 591, 592 (7th Cir. 2011) (citing *Nelson v. Miller,* 570 F.3d 868 (7th Cir. 2009)).

## IV.  Rowe's Motion for Summary Judgment

Rowe seeks summary judgment on his claims. Rowe's cross-motion for summary judgment, however, fails to show that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law. Most problematic is the fact that Rowe did not present a statement of facts not in dispute as required by Local Rule 56-1(a). Instead, Rowe states that he "incorporates all factual representations [he] made in the above statement of material facts in dispute" as well as any material facts stated in the arguments section of his brief. This he cannot do. The Court has no obligation to parse through these materials in search of a basis on which to determine that Rowe is entitled to judgment as a matter of law. *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) ("[D]istrict courts are not obliged . . . to scour the record looking for factual disputes. . . ."). To conclude otherwise would put the defendants in the impossible position of having to guess which facts the Court might identify as being material facts not in dispute and then formulate a response in opposition. In this case, the defendants did not even try.

Accordingly, Rowe's cross motion for summary judgment [dkt. 128] must be **denied** because the record fails to establish that he is entitled to judgment as a matter of law as to his claims.

## V.  Defendants' Motion for Summary Judgment

The defendants' also seek resolution of this action through summary judgment. The defendants argue that they are entitled to qualified immunity and that the "plaintiff can neither establish that defendants' actions constituted constitutional violations nor prove they violated RLUIPA." Dkt. 90 at p. 29. This is a proper basis upon which to seek summary judgment because

the "burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325.

### A. Material Facts

On the basis of the pleadings and the expanded record, the following facts are undisputed for purposes of the defendants' motion for summary judgment or if disputed are recited in the manner most favorable to Rowe as the non-movant.[4]

Rowe is currently incarcerated at Wabash Valley.

Rowe believes in Identity Christianity. Rowe is an associate pastor of the CJCC and an ordained reverend of the Church of the Nat'l Knights, both of which are Identity Christian churches. See dkt. 127-1 at 50. According to Rowe, every Identity Christian believes in and advocates racial separatism and some adherents (including Rowe) interpret the Bible as saying that the White Aryan race are mentally and spiritually superior to non-white races. Dkt. 128 at 15. The CJCC is recognized by the IDOC. See dkt. 127-1 at p. 51-52, see also Exh. E (IDOC Religious Handbook, CJCC excerpt) attached to this Entry. The Aryan Nations is the political arm of the CJCC. Dkt. 128 at p 17. The Aryan Nations Standard is a symbol which is used by both the CJCC and its political arm, the Aryan Nations. See dkt. 128 at 19 and Exh. F attached to this Entry. Publications containing the Aryan Nations standard have been confiscated.

Rowe is recognized by the IDOC as a validated member of a white supremacist prison gang or STG. Rowe denies that he is a member of a prison gang and argues that the STG label has been erroneously applied to him. Rowe states that he is merely a validated Identity Christian adherent

---

[4] The facts which relate to the individual defendants presented in the defendants' statement of undisputed facts are not, as the plaintiff points out, supported by a citation to any evidence. See dkt. 90 at p. 2-3 (fact numbers 1-18). The plaintiff's objection on this basis is **sustained.** See dkt. 128 at 14. Local Rule 56-1(e) states that a party must support each fact asserted in a brief with a citation to supporting evidence in the record. Because the defendants failed to do so these unsupported facts are disregarded.

and member of Identity Christian Churches. Dkt. 128 at p. 16.

Rowe has numerous swastika tattoos that he displays.

Racial tension and STG activities affect non-STG members and staff safety.

Department policy provides that mail should be withheld if it is a danger to the safety and security of the facility or if it would foil a reformative goal of the department. Publications threaten the safety and security of the facility if they would inflame already high racial tensions, advocate violence, have incendiary language or symbols, or contain information that is useful in attempts to escape or make weapons.

Race based and religion based violence has occurred in prisons.

## B. First Amendment Claims against Individual Defendants

Rowe seeks compensatory,[5] punitive and nominal damages against the individual defendants. "[T]o recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Johnson v. Snyder,* 444 F.3d 579, 583 (7th Cir. 2006) (internal quotation omitted). "A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." *Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001); *Burks v. Raemisch,* 555 F.3d 592, 593-94 (7th Cir. 2009) ("Section 1983 does not establish a system of vicarious responsibility. Liability depends on each defendant's knowledge and actions,

_____

5 The Prisoner Litigation Reform Act ("PLRA") makes compensatory damages for mental or emotional damages unavailable to Rowe under the circumstances alleged. The PLRA provides A[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.@ 42 U.S.C. ' 1997e(e). Accordingly, Rowe's call for compensatory damages is limited in this regard. In addition, there is no evidence in the record which would support a finding of punitive damages. Punitive damages may be awarded when a defendant's conduct is motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Gloria Coleman v. Nurse Ruth Rahija*, 114 F.3d 778 (8th Cir. 1997). Thus, even if the individual defendants were not entitled to qualified immunity, it appears (although not argued by either party) that the most Rowe could recover is nominal damages against the individual defendants.

not on the knowledge or actions of persons they supervise. . . . *Monell's* rule [is that] that public employees are responsible for their own misdeeds but not for anyone else's.")(citing *Monell v. New York City Dep't of Social Services,* 436 U.S. 658 (1978)).

The defendants argue that they did not violate Rowe's constitutional rights and that they are entitled to qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *accord, e.g., Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).

To defeat a defense of qualified immunity, a plaintiff must take two steps. First, the plaintiff must first allege and then show facts amounting to an actual violation of his or her constitutional rights. Second, the plaintiff must show that the violation of constitutional rights was clearly established under applicable law at the time and under the circumstances that the defendant official acted. *Pearson*, 555 U.S. at 232. In other words, the plaintiff must show not only that his constitutional rights were violated, but that any reasonable official under the circumstances would have realized that his rights were being violated.

For the reasons explained below, the individual defendants' motion for summary judgment is granted on all claims alleged against them on the basis that they are entitled to qualified immunity.

### 1. Review and Confiscation of Correspondence

Defendants Alberta Potter (PCF's Mailroom Supervisor) and Walter Peterson (PCF's STG Coordinator) are allegedly responsible for delaying Rowe's receipt of Identity Christian materials dealing with violence or white supremacy for excessive amounts of time. See dkt. 1-1 at p. 1-2.

#### a. Alberta Potter

Rowe claims that Potter violated his right to due process by forwarding his mail to Peterson without notice. Specifically, Rowe claims that Potter failed to complete a "Notice and Report of Action Taken on Correspondence" (State Form 11984) on fourteen occasions. Dkt. 128 at p. 67. The defendants explain that Potter directed Rowe's Identity Christian materials dealing with violence or white supremacy and identified as possible STG materials to Peterson for evaluation, as neither the chaplain nor the mailroom supervisor are trained to evaluate STG materials. Potter is entitled to qualified immunity because Potter did not violate Rowe's constitutional rights and such rights were not clearly established under applicable law at the time. First, § 1983 protects plaintiff from constitutional violations, not violations of state laws or departmental regulations. *See Scott v. Edinburg,* 346 F.3d 752, 760 (7th Cir. 2003). No constitutional violation exists for failing to fill out a state form. Second, Rowe has no constitutional right to dictate who reviews his materials and the forwarding of most of Rowe's Identity Christian materials which were identified as possible STG materials to Peterson, a STG Coordinator, for review is reasonably related to preserving the order of the penal institution. Even if Rowe's materials were not timely evaluated by Peterson, Potter is not personally responsible for this inaction. Accordingly, defendant Potter is entitled to qualified immunity as to this claim.

### b.     Walter Peterson

Rowe alleges that Peterson consistently took an excessive amount of time to review and deliver his Identity Christian materials and that materials were confiscated which should not have been.

A prison mail policy restricting access to potential violence producing materials is valid under the First Amendment. *Chriceol v. Phillips,* 169 F.3d 313, 316 (5th Cir. 1999) (discussing withholding of CJCC and Aryan Nations materials) (citing *McCabe v. Arave*, 827 F.2d 634, 638 (9th Cir. 1987) (holding that a total ban on literature advocating racial purity "cannot be constitutionally banned as rationally related to rehabilitation" but recognizing that literature advocating violence or illegal activity could be banned); *Murphy v. Missouri*, 814 F.2d 1252, 1256–57 (8th Cir. 1987) (holding a total ban on Aryan Nation materials too restrictive, but stating a policy restricting materials that advocate violence or that are racially inflammatory would be valid); *Winburn v. Bologna*, 979 F. Supp. 531, 534 (W.D. Mich. 1997) (prison mail policy withholding material that promotes violence and racial supremacy reasonable and valid); *Thomas v. United States Secretary of Defense*, 730 F. Supp. 362 (D. Kan. 1990) (regulation rejecting mail that communicates information designed to encourage prisoners to disrupt institution by strikes, riots, racial or religious hatred does not violate First Amendment)).

In addition, it is undisputed that Peterson did not implement a total ban on CJCC materials and that Rowe received most of the materials which Peterson reviewed. See dkt. 128 at p. 47, fn. 27. *See e.g., Williams v. Brimeyer*, 116 F.3d 351, 354 (8th Cir. 1997) (holding plaintiff entitled to receive certain CJCC publications where the publications do not counsel violence and there is no evidence that they have ever caused a disruption). In addition, Rowe has not presented any evidence that would suggests that any delay in reviewing his correspondence which was identified

as potential STG material was intentional or excessive. There was no clearly established constitutional right to receive correspondence within a certain timeframe under applicable law at the time Peterson conducted his review. *See generally Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989) (discussing Federal Bureau of Prisons regulations that authorized wardens to reject incoming publications that were determined to be detrimental to the institution's security or that might promote criminal activity following individual review). Under these circumstances, Peterson is entitled to qualified immunity as to the claim that he violated Rowe's First Amendment rights in reviewing certain correspondence identified as possible STG materials to determine whether they posed a threat to institutional security. Even if Peterson did violate Rowe's constitutional rights, such rights were not clearly established under applicable law at the time.

If Rowe believes that specific publications were improperly withheld from him following review and if those publications have still not been provided to him, he could have requested that the denial of these specific materials be reviewed for the purpose of obtaining injunctive relief under RLUIPA.[6] No such claim for injunctive relief is understood to be pursued in this action.

### 2. Swastika

Rowe also alleges that certain defendants violated his First Amendment rights in prohibiting him from possessing a swastika necklace. The defendants are entitled to qualified immunity as to this claim. There is no evidence to suggest that denying Rowe the opportunity to wear a swastika necklace violated Rowe's clearly established First Amendment rights. *See Pearson*, 555 U.S. at 232.

"Regardless of its ancient or historic origins, the swastika today is a potent symbol of

___

6 Rowe states that he challenges the confiscation of 11 publications. Dkt. 128 at p. 49. He specifically alleges that publications were improperly confiscated on November 30, 2010, and January 19, 2011. Dkt. 128 at p. 36. In particular, Rowe takes issue with Peterson's decision to confiscate materials which depict gatherings of the KKK and the Aryan Nations Standard on the basis that it is a gang symbol and STG material. See Exhibit F (picture of the Aryan Nations Standard).

intolerance, hatred, and violence. As such, prison officials may have a valid penological interest in prohibiting the wearing of swastikas." *Dickinson v. Austin*, 1991 WL 166411, 2 (9th Cir. August 30, 1991) (unpublished opinion). In addition, the Seventh Circuit has held that inmates can be denied symbols which identify prisoners with gangs or other non-religious separatist groups. *Kaufman v. Karlen*, 270 Fed.Appx. 442, 445, 2008 WL 744140, 2 (7th Cir. 2008). The IDOC has identified the swastika as such a symbol. See Exhibit E. Further, no applicable federal law has been identified which upholds the right of a prisoner to keep a wearable swastika medallion. *Rooks v. Zavares*, 2001 WL 34047959, *12 (D.Colo. 2001); *see also Procunier v. Martinez*, 416 U.S. 396, 416 (1974) (suggesting that material which might encourage violence could be banned). Under these circumstances, the defendants are entitled to qualified immunity on this claim.

### 3. Implementation of Facially Neutral Policy

All the other defendants (including Dodd, Rogers, Bodlovich, Davis, Hemling, Buss, Morton, Richardson, Fowler, VanNatta, Ash, Pavese, Hall, Scaife, and Wilson) are only alleged to have implemented facially neutral policies in reviewing and denying Rowe's grievances. See dkt. 128 at p. 37. These policies (which form the basis for Rowe's RLUIPA claims) are valid under the First Amendment because they are reasonably related to legitimate penological interests.[7] There is a logical connection between the policies at issue and the legitimate government interest to justify it. Clearly, eliminating potential threats to the security or order of the facility is a legitimate interest. *Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996) (stating that "the most compelling governmental interest in a prison" is institutional security). Under these circumstances, the defendants' actions did not violate the First Amendment and the defendants are entitled to summary judgment as to these claims.

---

7 The specific legitimate penological interest associated with each policy is identified below in Part V(C) of this Entry.

## C. RLUIPA Claims

Rowe also seeks unspecified injunctive relief on the basis that the six policies identified above violate RLUIPA. These claims are understood to be alleged against the IDOC. For the reasons explained below, the IDOC is not entitled to summary judgment as to these claims.

To establish a claim under RLUIPA, an incarcerated plaintiff must demonstrate that he or she seeks to engage in an exercise of religion and that the challenged practice places a substantial burden on that exercise of religion. *Koger,* 523 F.3d at 796. Even if the plaintiff establishes these elements, the defendant may defeat the claim by showing that the burden is in furtherance of a compelling governmental interest and it is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc–1(a)(1)–(2); *Koger*, 523 F.3d at 796. Importantly, the substantial-burden inquiry does not invite the court to determine the centrality of the religious practice to the adherent's faith; and free-exercise doctrine makes it clear that the test for substantial burden does not ask whether the claimant has correctly interpreted his religious obligations. *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013).

**1.      The Zero Tolerance Policy on Security Threat Groups** ("STG"), identified by Rowe as IDOC Policy No. 02-03-105. See dkt. 127-1 at p. 25, ¶¶ 48-50. (Attached to Entry as Exhibit A). The IDOC's legitimate interest in institutional security justifies this policy. This policy is problematic to Rowe for two reasons. First, Rowe argues that the IDOC's definition of STG is overly broad and could be interpreted to include religious groups and churches including the CJCC. In fact, Rowe claims that his religion CJCC has been labeled an STG. Dkt. 128 at p. 46. This conclusion is a material fact in dispute. There is no dispute that the IDOC has labeled Rowe as a validated member of a white supremacist prison gang or STG, but it is unclear the basis upon which this label was applied to Rowe.

Second, it appears that the CJCC's close affiliation with the Aryan Nations (the undisputed political arm of the church) and the content of some CJCC publications have subjected Identity Christian publications to additional scrutiny as STG material. Rowe complains that his Identity Christian materials have been sent to the STG Coordinator for review instead of the chaplain and that some materials have been confiscated as STG related. Rowe argues that his Identity Christian materials should be reviewed only under the religious services policy which contemplates RLUIPA.

The IDOC seeks summary judgment on the basis that Rowe has not been substantially burdened in the exercise of his religion as a result of the policy. However, if the CJCC has been determined to be an STG or if all CJCC publications have been deemed STG materials then these determinations create a substantial burden to the practice of Rowe's religion given the zero tolerance policy. Whether the IDOC has a compelling governmental interest in labeling the CJCC as a STG is a material fact in dispute. Accordingly, this claim cannot be resolved through summary judgment.

**2.** **The visitation policy** prohibiting current prisoners from receiving visits from ex-prisoners that are not immediate family to the current prisoner. Identified by Rowe as IDOC Policy No. 02-01-102. (Attached to Entry as Exhibit B). The IDOC's legitimate interest in deterring trafficking of illicit materials into prison, promoting rehabilitation, and protecting institutional security justifies this policy. Rowe explains that most free-world administrative overseers of the CJCC's prison ministry are ex-offenders and the policy being challenged prohibits Rowe from receiving visits from them. Rowe intends to have ex-offenders from the CJCC prison ministry visit him as a way to practice his religion and he would like to visit offenders following his release.

The defendants argue that this claim is moot, but Rowe alleges that his need to receive ex-offenders as visitors (in particular James Read, his spiritual advisor) is on-going. This claim requires further development and summary judgment is denied.

**3.** **The property policy** limiting prisoners to only possessing one authoritative religious text book and twenty additional books (unless in an approved religious study course). Identified by Rowe as Policy No. 02-01-101. See dkt. 127-1 at 31 ¶ 118. (The Court was unable to locate a copy of this policy in the record or online). The IDOC has a legitimate interest in restricting the number of books and publications that may be used to hide various types of contraband or may be used as weapons to promote facility security. The defendants explain that the book and publication limit for Level 3 and 4 facilities is twenty books and one authoritative religious text. Rowe argues that he needs at least 60 books generally and at least 10 to 15 different books a day to effectively practice Identity Christianity. Dkt. 128 at p. 73.

Whether or not the book limit is a substantial burden on Rowe's religious exercise is a material fact in dispute. In addition, whether the book and publication limit protects the compelling governmental interest of facility safety and security also requires further development. Summary judgment on this claim is denied.

**4.** **The correspondence policy prohibiting offender-to-offender mail when one of the prisoners is on any type of segregation unit.** Identified by Rowe as Policy No. 02-01-103. See dkt. 127-1 at 33 ¶¶ 130-131. (The relevant portion of this policy is attached to this Entry as Exhibit C). The IDOC has a legitimate government interest which justifies this policy. That is, by restricting communications between offenders on segregation and the general prison population, prison staff is able to better preserve facility order, prevent organized attacks, and remove the leaders of STGs from their gangs. The defendants argue that this claim is moot because Rowe is no

longer in administrative segregation. Rowe admits that he is not on a segregation unit but states that he likely will be in the future. Rowe states that he would like to write several people on administrative segregation as a religious exercise but he cannot because the policy prohibits him from doing so. Whether Rowe's practice of his religion is substantially burdened by this policy and whether the IDOC has a compelling interest in prohibiting this type of correspondence are material facts in dispute given the current record. Summary judgment on this claim is denied.

5.      **The correspondence policy prohibiting "item censorship"** of religious publications/correspondence. Identified by Rowe as Policy No. 02-01-103. See dkt. 127-1 at p. 38, ¶ 184. (The relevant portion of this policy is attached to this Entry as Exhibit D). Rowe contends that IDOC's policy of banning an entire document because of any objectionable content violates RLUIPA, and he would advocate for censoring only the objectionable parts ("item censorship"). Specifically, he would like certain books, which contain components advocating violence against the Jewish people, use racial slurs and/or depict swastikas and Klan gatherings redacted by facility staff at his request. Dkt. 128 at p. 35.

The IDOC has a legitimate government interest which justifies this policy. That is, banning violent materials promotes security and reviewing each page of every single document would cause unreasonable delay in the delivery of documents sent to the facility. In addition, it is possible that staff could miss material that should be censored in longer documents creating a security risk.

Whether Rowe's exercise of religion is substantially burdened by this policy and whether the IDOC has a compelling governmental interest which is furthered by the policy which is the least restrictive means of furthering that interest is a material fact in dispute. Accordingly, summary judgment is not proper as to this RLUIPA claim.

**6.    The department-wide ban on the swastika.** Rowe states that he would like to obtain and wear a swastika necklace as religious exercise and that the ban prevents him from doing so. Dkt. 128 at p. 36, see also Exhibit E. He also wants to send and receive materials with a swastika displayed. He seeks a personal religious exception to the ban on swastikas. The defendants' claim that the swastika is the primary symbol of white supremacist STG is not supported by admissible evidence. Rowe disputes any assertion that the swastika, in isolation, is a gang symbol. Dkt. 128 at p. 60. This claim requires further development and summary judgment is not appropriate given the current record.

## VI.   Conclusion

The individual defendants are entitled to qualified immunity as to the § 1983 claims for money damages alleged against them. This Entry resolves all claims against all defendants with the exception of the RLUIPA claims against the IDOC.

The RLUIPA claims against the IDOC remain for resolution. The issues for trial are the following: 1) whether the IDOC's Zero Tolerance Policy on STGs violates RLUIPA; 2) whether the IDOC's visitation policy prohibiting current prisoners from receiving visits from ex-prisoners that are not immediate family to the current prisoner violates RLUIPA; 3) whether the IDOC's property policy limiting prisoners to only possessing one authoritative religious text book and twenty additional books (unless in an approved religious study course) violates RLUIPA; 4) whether the IDOC's correspondence policy prohibiting offender-to-offender mail when one of the prisoners is on any type of segregation unit violates RLUIPA; 5) whether the correspondence policy prohibiting "item censorship" of religious publications/correspondence violates RLUIPA; and 6) whether the ban on the swastika as a religious symbol violates RLUIPA. All other RLUIPA claims are understood to be moot or abandoned. See dkt. 128 at 32-33 and 36.

The only remaining remedies Rowe is entitled to seek in this action for the alleged RLUIPA violations are equitable in nature. The defendants' made a jury demand, but "[t]here is no right to a jury where the only remedies sought (or available) are equitable." *Kramer v. Banc of America Securities, LLC*, 355 F.3d 961, 966 (7th Cir. 2004); *see, e.g., Marseilles Hydro Power, LLC v. Marseilles Land and Water Co.*, 299 F.3d 643, 648 (7th Cir. 2002) ("If the only relief sought is equitable ... neither the party seeking that relief nor the party opposing it is entitled to a jury trial."). Having found that there is no federal right to a jury trial on the remaining issues in this case, see Federal Rules of Civil Procedure 39(a)(2), this action will be set for a bench trial in a separate Entry.

If Rowe requests counsel to represent him at the bench trial of this action, the court will undertake efforts to attempt to recruit counsel to represent him for that purpose. Rowe shall have **through March 20, 2014,** to make such a request.

Consistent with the foregoing, the plaintiff's motion for summary judgment [dkt. 128] is **denied** and the defendants' motion for summary judgment [dkt. 89] is **granted in part and denied in part.** No partial final judgment shall issue at this time as to the claims resolved in this Entry.

**IT IS SO ORDERED.**

Date:   _03/03/2014_

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

JEFFREY ALLEN ROWE
DOC # 116017
Wabash Valley Correctional Facility
Electronic Service Participant -- Court Only

All Electronically Registered Counsel