**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JEFFREY ALLEN ROWE, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:11-cv-524-JMS-MJD |
| vs. | ) | |
| | ) | |
| INDIANA DEPARTMENT OF | ) | |
| CORRECTION, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

Plaintiff Jeffrey Allen Rowe, a white supremacist and self-described pastoral leader of the Church of Jesus Christ Christian (CJCC) and the Church of the National Knights, filed this civil action alleging that five policies of the Indiana Department of Correction (DOC) have unlawfully impeded his ability to practice his religion. Rowe's claims present the obvious inherent difficulty (for both prisoners and prison officials) that results when inmates seek to exercise a religion which holds the same beliefs, objectives, and goals as the Aryan Nations, a secular organization which has utilized violence in its quest for white supremacy.

### I.      Background

The claims remaining for resolution in this action are brought pursuant to the Religious Land Use and Institutionalized Persons Act (or the Act), 42 U.S.C. §§ 2000cc to 2000cc–5.[1]

---

[1] All other claims were abandoned or resolved in the Entry of March 3, 2014. Dkt. 131 at 5 (discussing cross motions for summary judgment and recognizing Rowe's voluntarily dismissal of a host of claims). As Rowe himself stated, "Any other claims Rowe has, that he has not already voluntarily dismissed, or argued herein for summary judgment in his favor, Rowe hereby voluntarily dismisses." Dkt. 128 at p. 82. Following the Court's ruling on the motion for summary

Section 2000cc–1(a) of the Act provides this general rule: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title ... unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *See generally Cutter v. Wilkinson*, 544 U.S. 709 (2005); *Mutawakkil v. Huibregtse*, 735 F.3d 524, 526 -527 (7th Cir. 2013).

Rowe alleges that five DOC policies have interfered with his ability to practice his religion as an adherent and pastor of the CJCC. He seeks injunctive relief in the form of a religious exemption prohibiting the DOC from applying aspects of these policies to him and members of his faith group. The five policies at issue were stipulated to by the parties and are identified in the Entry of July 29, 2014. See Dkt. 165. Rowe's claims are:

**Claim 1: Rowe's challenge to the Security Threat Groups (STG) Policy 02-03-105 [dkt. 165-1].** Rowe challenges the STG policy on two grounds. First he claims that he was improperly labeled a STG member because of his interpretation of the Bible. Second, Rowe alleges that the STG policy should specifically exclude religious groups from being labeled a STG.

**Claim 2: Rowe's challenge to the Offender Visitation Policy 02-01-102 [dkt. 165-2].** Rowe challenges the offender visitation policy on the basis that it restricts ex-offenders ability to

---

judgment Rowe disputed the Court's determination that he had abandoned all claims except his First Amendment and RLUIPA claims. In response, the Court noted that Rowe's blanket assertion was insufficient and that the Court would not piece through Rowe's 83-page handwritten memorandum to verify his assertion. See dkt. 141 at p. 3. Rowe was instructed to point to the section of his briefing which dealt with the allegedly overlooked claims with specificity. *Id.* Rowe was provided a copy of his memorandum at his request so that the claims could be identified. Dkt. 145. No further information was provided by Rowe and there is no basis upon which to conclude that any claims were improperly deemed abandoned by the Court and remain for resolution.

visit offenders in DOC facilities. Rowe argues that this restriction limits who he can meet with "in the name of Jesus."

**Claim 3: Rowe's challenge to the DOC's Property Limits [dkt. 165-3].** Rowe challenges the DOC's property limits on the basis that it unlawfully limits his ability to study his religion and share publications with other offenders.

**Claim 4: Rowe's challenge to the Offender Correspondence Policy 02-01-103 [dkt. 165-4].** Rowe challenges the offender correspondence policy on two grounds. First, he asserts that pursuant to the policy, publications are being unlawfully confiscated and withheld from him. He suggests that instead of withholding the entire publication, the offending material should be removed by DOC officials and the remaining materials provided to him. Second, Rowe claims that the policy prohibits him from corresponding with other inmates about his faith when he or the inmate he seeks to communicate with is on restricted status.

**Claim 5: Rowe's challenge to the Identity Christianity, Handbook of Religious Beliefs and Practices [dkt. 165-5].** Rowe challenges the Handbooks' statement that the swastika is not an authorized symbol. Rowe asserts that the Handbook's swastika ban unlawfully prohibits him from wearing a necklace with a swastika pendent.

To prevail on his remaining claims for injunctive relief, Rowe must show that the DOC's policies create a substantial burden on his religious exercise. *See Patel v. Bureau of Prisons*, 515 F. 3d 807, 814 (8th Cir. 2008) ("[T]he same definition of 'substantial burden' applies under the Free Exercise Clause, RFRA, and RLUIPA."). A law, regulation, or other governmental command substantially burdens religious exercise if it "bears direct, primary, and fundamental responsibility for rendering [a] religious exercise . . . effectively impracticable." *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013) (citing *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752,

761 (7th Cir. 2003)). "[P]reference or convenience is not the standard." *Mutawakkil,* 735 F.3d at 527.

Even if a substantial burden is shown, Rowe's claims cannot prevail if the burden created by the policies is in furtherance of a compelling governmental interest and it is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc–1(a)(1)–(2); *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008). "[P]rison security is a compelling state interest, and [] deference is due to institutional officials' expertise in this area." *Cutter v. Wilkinson*, 544 U.S. 709, 725 (2005). The Supreme Court has stated that the Act should be applied in an appropriately balanced way, with particular sensitivity to security concerns.

> While the Act adopts a compelling governmental interest standard, context matters in the application of that standard. Lawmakers supporting [the Religious Land Use and Institutionalized Persons Act] were mindful of the urgency of discipline, order, safety, and security in penal institutions. They anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

*Id.* at 722-723 (internal quotations and citations omitted).

The Court conducted a two-day bench trial in this action. Rowe appeared in person, pro se, and with stand-by counsel. Defendant appeared by counsel. After consideration of the evidence presented during the bench trial, the Court now issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1).[2] The Court recognizes that there was conflicting testimony on several issues presented at trial. The findings set forth below reflect the testimony that the Court credited. For ease of review, the Court's findings of fact and conclusions

---

2 Any finding of fact that is more properly considered a conclusion of law is adopted as such. Similarly, any conclusion of law that is more properly considered a finding of fact is adopted as such.

4

of law are set forth separately as to each claim. But first, a few facts are set forth which apply to all claims.

## II.    Findings of Fact As to All Claims

### A.  The Church of Jesus Christ Christian

Rowe's stated religion is Identity Christianity. He is an associate pastor of the Church of Jesus Christ Christian and an ordained reverend of the Church of the National Knights, both of which are Identity Christian churches. The Church of the National Knights is a business of the Ku Klux Klan and recognized by the State of Indiana as "Church of the National Knights of the Ku Klux Klan, Incorporated." According to Rowe, every Identity Christian believes in and advocates racial separatism and some adherents (including Rowe) interpret the Bible as saying that the White Aryan race is mentally and spiritually superior to non-white races. Identity Christian adherents believe that Jews are their enemy. Rowe testified that membership in his church is limited to whites only. Potential members are required to study for six months to a year and must submit to a test. Memberships are voted on at the local level and then submitted to Rowe who, as the state leader, approves or denies memberships. Rowe's knowledge of the CJCC and his "charisma" are responsible for his leadership status.

The Aryan Nations is the political arm of the CJCC. Prisoners are prohibited from being Aryan Nations members until their release from prison, when they are expected to join. As Rowe testified, the CJCC and Aryan Nations are two sides of the same coin. They hold the same beliefs, goals and objectives. Those goals include creating a pure white homeland and creating understanding among all people that the white race is being bred out of existence. The CJCC and Aryan Nations support the actions of the Ku Klux Klan and vice versa. The Aryan Nations has a violent history. For example, in 1998, a former Aryan Nations guard killed one person and shot

five others, proclaiming his actions a wake-up call to America to kill all Jews. In Idaho in 2000, an Aryan Nations guard chased down and killed a black mother and her son for stopping in front of the Aryan Nations compound. DOC has relied on the Federal Bureau of Investigation's determination that the Aryan Nations is a domestic terrorist threat in classifying the Aryan Nations as a prison security threat group.

Based on the testimony presented, the Court infers that the reason for the distinction between the Aryan Nations and CJCC is superficial. It is a thinly veiled attempt to pursue under the guise of religion (and the protections of the Act) that which would not be tolerated if it were pursued via a secular organization. As the CJCC prison ministry foundation packet states: "There are very good reasons for this policy [that prisoners must address themselves as church members only]; legal reasons. You are asked to trust your church leadership to protect your best interests." Pl. Exh. 51 at p 24-25. As Rowe explained, the CJCC was created because Aryan Nations sounded too much like the Aryan Brotherhood and the Aryan Brotherhood's operations in prison are prohibited because it is a recognized white supremacist prison gang that resorts to violence to achieve its goals. In addition, Rowe's witnesses corroborated the lack of distinction. Paul Mullet testified that there is no separation between the faith and politics of the Aryan Nations as reflected in the CJCC Prison Ministry Foundation Packet. Similarly, Eli James testified that Christian Identity does not distinguish religion from politics because ethical beliefs must be adhered to in daily life, such that if you believe in racial segregation, you act accordingly.

That said, the CJCC is a religion recognized by the DOC, and its legitimacy was not challenged in this case. See dkt. 165-5. The Court will treat it as such.

### B. Racial Violence in Prison

Religious and race based violence occurs in DOC prisons with unfortunate frequency.

White supremacist prison gangs are active and pose a threat to facility safety as demonstrated by their advocacy of violence and past incidents of violence. For example, at Pendleton Correctional Facility earlier this year, members of the Saxon Knights, a white gang, attacked another offender. In April, an Aryan Brotherhood member was murdered in a racially related incident. At Westville Correctional Facility, in 2013, a large incident erupted when a white offender assaulted black offenders in the dining hall. On the way back out of the dining hall the black offenders passed a verbal message back to the housing units that black offenders were to assault all white offenders in all the housing units and numerous violent assaults resulted.

Rowe and the offenders he called as witnesses[3] attempted to downplay racial tensions as a cause of violence in prison. The witnesses are not credited, as their testimony is rife with bias and each is a convicted felon. Each of the witnesses also has some affiliation with white separatist or white supremacist ideological groups and a self interest in suggesting that their association does not contribute to discord in the prison setting. In fact, Rowe himself has been involved in interracial violence. For example, Rowe himself checked into protective custody because he owed a drug debt to a member of the Gangster Disciplines an African-American prison gang. On another occasion, Rowe had a problem with the Latin Kings, a Hispanic gang, to which he owed a debt.

The Court also accepts the DOC's witnesses' testimony that depictions of the KKK and the use of the N-word and other demeaning language used in a derogatory manner is particularly inflammatory in the prison setting.

With these facts in mind, the Court now turns to Rowe's specific claims for injunctive relief.

---

3 The exception is witness James Roland, who testified that he has seen well over fifty fights and that many of those fights involved people of different races fighting each other. Roland, also a white supremacist, was personally involved in two separate fights involving minorities.

### III.    Claim 1: Rowe's Challenge to the Security Threat Group Policy

Rowe challenges the Security Threat Group (STG) policy on two grounds. First, he claims that he has been improperly labeled a STG member because of his interpretation of the Bible. Second, Rowe argues that the STG policy should specifically exclude religious groups from being labeled STGs.

#### 1.    Findings of Fact

Rowe is recognized by the DOC as a validated member of a security threat group (STG). A STG is:

> A group of offenders that set themselves apart from others; pose a threat to the security or safety of staff or offenders; or, are disruptive to programs or the orderly management of the facility.
>
> . . . .
>
> The operational objectives for monitoring and controlling Security Threat Group (STG) members are:
>
> A.    To protect the public and communities from STG members;
> B.    To provide a safe correctional environment for staff and offenders in Department facilities by implementing a Zero (0) Tolerance for STG activity; and,
> C.    To effectively identify, monitor and control the incarceration of STG members by anticipating questionable activities (scams, possible criminal acts, etc.), and potential volatile situations before such incidents occur.

Dkt. 165-1 (Security Threat Group Policy).

The application of the STG label to Rowe is well founded. Rowe is a self-proclaimed white supremacist and racist. Rowe vocally advocates the supremacy of white people. In addition, Rowe's white supremacist beliefs are reflected in his tattoos. He has a tattoo of lightning bolts which he says represent "SS" or the elite German troops in WWII. Offender witness Hezekiah

Colbert testified that this is also the symbol used to identify members of the Aryan Brotherhood (of which Colbert was a member). Rowe also has a tattoo of an "88" which he acknowledges stands for Heil Hitler and is associated with Nazi sympathizers. Rowe has an Aryan Nations tattoo, a confederate flag tattoo, a Klansman tattoo and a white power tattoo with a swastika on it. A swastika tattoo is visible on his hand and on the back of his head.

Rowe previously associated with the Ku Klux Klan (or KKK) as a member of the White Knights organization in 2007. He is associated with the KKK now as an ordained reverend of the Church of the National Knights of the Ku Klux Klan, Incorporated. In 2001, Rowe admitted to a DOC employee he was a member of the Aryan Brotherhood. He was involved in five physical altercations between 2001 and 2013, all with individuals of other races. In addition, the DOC determined that Rowe associated with other confirmed STG members and STG writings were confiscated from Rowe's cell and mail. At present, the DOC understands Rowe to be an independent white supremacist not solidly associated with any particular group.

Rowe's testimony that he has never belonged to any prison gang and that he has been identified as a STG member because of his interpretation of the Bible is not credible. The evidence reflects that Rowe is attempting to use his religion to manipulate the conditions of his confinement in a way which could threaten the security of any facility in which he is housed.

The CJCC has not been labeled an STG by the DOC.

## 2. Conclusions of Law

Rowe has failed to demonstrate that the STG policy has burdened (in any way) his ability to practice his religion. To the contrary, the CJCC is not considered an STG by the DOC. Similarly, there is no evidence that the fact that Rowe is recognized by the DOC as a validated member of a

STG has substantially burdened his religious exercise. Rowe failed to provide any credible link between the STG policy and his religious exercise.

Rowe's argument that the STG policy violates the Act because it fails to specifically exclude religious groups from its definition is rejected. The DOC has a compelling interest in prohibiting groups of offenders from threatening the security or safety of staff or offenders and disrupting programs and the orderly management of the facility. If a group of offenders undertake these destructive goals in the name of religion, the DOC has a compelling interest in stopping those activities. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353 (1987). As an example, the radical religious group called the black magic religion was previously labeled a STG by the DOC because that religious group required the use of human body fluids such as blood, urine, feces and human body parts in the practice of their religion. The DOC did not allow those groups to participate in religious activities at DOC facilities after an inmate tried to cut his cellmate's toe off for a spell. As this example reflects, the Act does not require the abandonment of common sense. Nor does the Act entitle inmates to threaten the safety and security of the facility in the name of religion. The DOC's STG policy is appropriately open ended because it is impossible to predict all religions and religious practices which may pose a threat to safety and security. *See Borzych v. Frank*, 439 F.3d 388, 392 (7th Cir. 2006). Under these circumstances, any vagueness resulting from the policy does not create a substantial burden on Rowe's religious exercise.

In summary, Rowe's religious exercise has not be substantially burdened by the STG policy and Rowe has failed to meet his burden of proof. The STG policy does not violate the Act and the defendant is entitled to judgment in its favor on this claim.

## IV.    Claim 2: Rowe's Challenge to the Offender Visitation Policy

Rowe challenges the offender visitation policy because it restricts ex-offenders ability to visit

offenders in DOC facilities and thus limits his ability to come together with others in the name of Jesus.

## 1. Findings of Fact

Rowe testified that it is his belief that two or more people have to come together in the name of Jesus for Jesus and the Holy Spirit to be present. Visitation is one way for Rowe to meet with other people. The DOC's offender visitation policy provides:

> Ex-offenders shall not be permitted to visit offenders in Department facilities without the prior written approval of the Facility Head of the facility housing the offender to be visited. Ex-offenders shall be approved or denied for visitation on a case-by-case basis. . . . The Facility Head shall consider the safety and security of the individuals and the facility as well as the value of the visit to the offender when granting approval or denial of requests to visit by ex-offenders.

Dkt. 165-2.

Rowe complains that when he was incarcerated at the Indiana State Prison the Superintendent, pursuant to the visitation policy, denied him visitation privileges with James Read, a convicted felon, who is an associate pastor of the CJCC. Rowe has not tried to have Read added to his visitor list since, even though he was subsequently transferred to two other facilities with different superintendents from whom he could have sought approval. Rowe remains able to communicate with James Read by letter and telephone. Even so, during the course of this litigation more than a year passed without any communication between Rowe and Read. In addition, Rowe has another pastor on his visiting list, Eli James (the same Eli James who testified at trial).

## 2. Conclusions of Law

Rowe has not shown that his religious exercise of meeting with at least one other person "in the name of Jesus" has been substantially burdened by the DOC's offender visitation policy. Specifically, there is no evidence that the denial of visitation with ex-offender James Read has substantially burdened Rowe's religious exercise. Rowe's unsubstantiated say-so is not enough

under the circumstances. These circumstances include the fact that Rowe made a single attempt to have Read added to his visitors list even following his transfer to different institutions. There is no evidence that Read would have made the trip to visit Rowe even if he had been approved to do so and the record does not reflect that Rowe has an on-going relationship with Read given their sparse communication by mail or phone.

Rowe has not been substantially burdened by the visitation policy and is not entitled to any relief under the Act. The DOC is entitled to judgment in its favor on this claim.

## V.      Claim 3: Rowe's Challenge to the Property Limits Policy

DOC policy allows offenders to possess one religious text or source book and twenty additional publications including books, magazines and newspapers. Dkt. 165-3. Rowe challenges the DOC's property limits on the basis that it unlawfully limits his ability to study his religion and share religious publications with other offenders.

### 1.   Findings of Fact

Rowe testified that it is his belief that he should study to show himself approved by God. Rowe testified that he needs approximately ten to fifteen books a day to effectively practice his religion and between sixty and seventy books at one time. This testimony is not credible. There is no support for Rowe's claim that he needs 60-70 books in his possession at one time. Rowe would like the convenience of having 60-70 books at a time so that he can read what he wants (including the fiction books in his possession) when he wants. In addition, Rowe has chosen to collect many books when he could instead rely on a compilation. This finding is based on the testimony of Rowe's witness Eli James, who explained that non-traditional books of the Bible (not contained in the King James Bible and relied on by Christian Identity adherents) have been collected and are available in one volume.

All parties agree that the book limit is not strictly enforced. Rowe has had publications confiscated on only two occasions for exceeding the publication quantity limits. Both times the books were confiscated when Rowe was being transferred between DOC facilities.

The book limit is in place to promote the DOC's compelling governmental interest in promoting safety and security. The DOC's witnesses provided compelling testimony in this regard. They explained that the book limit is necessary because there is limited space in the cells and excessive numbers of books can create both fire and safety hazards. In addition, books have been and can be used as weapons, body armor, and for hiding contraband. For obvious security reasons, prison officials must have the ability to efficiently and effectively conduct cell searches. For a cell search to be effective, officers are required to flip through each page of every book to insure that an offender has not used the book to hide contraband items such as knives, weapons, cell phones, narcotics, or messages.

### 2. Conclusions of Law

Rowe has not shown that the absence of any book in excess of the twenty-one book limit imposed a substantial burden on his ability to exercise his Identity Christian beliefs. *See e.g., Kaufman v. Pugh*, 733 F.3d 692, 699 (7th Cir. 2013) (absence of the books does not impose a substantial burden on Kaufman's ability to follow his atheistic beliefs). The Court accepts Rowe's testimony that studying the Bible, history and current events is an important practice of his Identity Christian Faith. Rowe's claim however that he is substantially burdened by the property limit is rejected. Rowe himself makes clear that he needs between ten and fifteen books a day. Even if Rowe maintained all of the source materials he claims he requires those materials would be within the book limit. There is no credible evidence that any book confiscated because it was in excess of the book limit resulted in a substantial burden on Rowe's religious exercise.

Relatedly, Rowe suggests that he needs a lending library of sorts to share his faith.[4] But there is no basis to conclude that Rowe's inability to provide a large lending library for the benefit of sharing his religion with other inmates substantially burdens his religious exercise. There is no explanation for why Rowe insists on being the individual tasked with distribution of Identity Christian literature. He could share his message and then encourage others to receive the same publications that he does by requesting the publications from the publisher. His insistence on the need for a library appears to be less about his personal faith exercise and more about his need to demonstrate to others that he is a primary source for Identity Christian materials consistent with his self-proclaimed leadership status.

Rowe has failed to demonstrate that the DOC's property limits have substanitally burdened his religious exercise. Accordingly, Rowe's claim for relief is denied and the DOC is entitled to judgment in its favor on this claim.

## VI. Claim 4: Rowe's Challenge to the Offender Correspondence Policy

Rowe challenges the offender correspondence policy on two grounds. First, he asserts that pursuant to the policy, publications are being unlawfully confiscated and withheld from him. He suggests that instead of withholding the entire publication, the offending material should be removed by DOC officials and the remaining materials provided to him. Second, Rowe claims that the policy unlawfully prohibits him from corresponding with other inmates when he or the inmate he seeks to communicate with is on restricted status.

### 1. Publication Censorship

#### a. Findings of Fact

---

4 There is no claim that any DOC policy prohibits Rowe from exchanging books with other inmates.

Rowe testified that given his incarceration, correspondence is one of his primary ways of communicating his religious message to others. Rowe receives the vast majority of the Identity Christian materials sent to him in prison. Any rejection of Rowe's Identity Christian mail was the result of an item-by-item review conducted by a STG investigator who in their experience determined that the material contained a threat to the safety of the facility. No incoming publication, book, or document has been confiscated merely because it was associated with the Identity Christian religion.

The Court reviewed the Identity Christian materials which were confiscated from Rowe and submitted into evidence. Each of these documents was properly confiscated consistent with DOC policy which provides that mail should be withheld if it is a danger to the safety and security of the facility or if it would foil a reformative goal of the department. Publications threaten the safety and security of the facility if they would inflame already high racial tensions, advocate violence, or have incendiary language or symbols. In particular, the Identity Christian materials that were rejected contain either gang symbols,[5] writing in code, exhortations to violence or

---

5 One such gang symbol is the Aryan Nations Standard which is the identifying symbol or patch for the Aryan Nations. It looks like this:



The Aryan Nations Standard is a symbol which is used only by the Aryan Nations. However, given the association between the CJCC and Aryan Nations, Rowe and other CJCC members such as Paul Mullett consider the Aryan Nations standard a religious symbol. The DOC does not allow the Aryan Nations' standard inside of the correctional facilities because it is associated with a domestic terrorist organization.

statements of racial hatred that could set off a violent incident, such that it was proper under the Act to keep them out of the prison environment.[6] Consistent with DOC policy, when it was determined that a portion of a publication was to be excluded from a facility, the entire publication was excluded. "Staff shall not attempt to remove the offending portions of the publication and give the remainder to the offender." Dkt. 165-4 at p. 23.

### b. Conclusions of Law

Rowe has failed to show that his religious exercise has been substantially burdened by the offender correspondence policy and in particular by the confiscation of Identity Christian publications which contain STG materials. Rowe received almost all of his religious publications. There is no credible evidence that the withholding of any particular religious publication created a substantial burden on Rowe's religious exercise. *Id. at* 390 ("We doubt that keeping these books out of the prison substantially burdens anyone's religious exercise. Borzych's only evidence on this point is his unreasoned say-so, plus equivalent declarations by other inmates."). Thus, Rowe's suggestion that the DOC should be required to remove or redact the offending material and then pass it along to him instead of simply prohibiting the publication is rejected. Under these circumstances no relief is warranted under the Act.

In addition, the facility's interest in curtailing racial violence within prison walls is compelling. Rowe argues that the DOC's witnesses exaggerated the security concerns associated with the Identity Christian materials which were confiscated from him "but a prisoner's view of what promotes prison security is hardly objective." *Id.* at 390-391. To the extent Rowe claims that

---

6 This is not the first time Rowe, has filed a federal lawsuit to complain about the confiscation of his white supremacist literature. In *Rowe v. Hanks*, 1:04-cv-1711-SEB-VSS (S.D. Ind.), Rowe alleged that on July 6, 2004, Sgt. John Doe discriminated against him by confiscating a letter sent to Rowe by Rev. Loy, Chief Minister and Overseer of the Church of the National Knights, Inc., because the Sgt. determined that the letter contained STG references.

his religious publications which contain STG material should be provided to him based on a religious exemption, this claim is denied. Such an exemption would unduly limit the prison because "it is impossible to foresee all literature that may pose a threat to safety and security." *Id.* at 392. Further, such an accommodation is completely contrary to the Supreme Court's statement in *Cutter v. Wilkinson,* that Courts are "expected to recognize the government's countervailing compelling interest in not facilitating inflammatory racist activity that could imperil prison security and order."[7] 544 U.S. 709, 723 fn.11 (2005); *citing Reimann v. Murphy*, 897 F.Supp. 398, 402-403 (E.D. Wis. 1995) (concluding, under Religious Freedom Restoration Act of 1993, that excluding racist literature advocating violence was the least restrictive means of furthering the compelling state interest in preventing prison violence); *George v. Sullivan*, 896 F.Supp. 895, 898 (W.D. Wis. 1995) (same).

For all of these reasons, the Act does not entitle Rowe to any relief from the offender correspondence policy and the DOC is entitled to judgment in its favor on this claim.

### 2. Offender-to-Offender Communication

Next, Rowe claims that the offender correspondence policy is unlawful because it prohibits him from corresponding with other inmates when he or the inmate he seeks to communicate with is on restricted status.

### a. Findings of Fact

The DOC's offender correspondence policy prohibits inmates who have been placed on restrictive status because their "continued presence in the general population would pose a serious

---

7 As the Supreme Court observed, given this compelling interest a member of the CJCC who challenges a prison officials' confiscation of his white supremacist literature under the Act is no more likely to succeed in his challenge than an "irreligious prisoner and member of the Aryan Nation who challenges prison officials' confiscation of his white supremacist literature as a violation of his free association and expression rights." *Id.* at 723, fn. 11.

threat to life, property, self, staff or other offenders or to the security or orderly operation of a correctional facility," from corresponding with offenders in the general population. Dkt. 165-4 at p. 3 and 5. The purpose of this policy is to limit communications which threaten the security of the facility. For example, gang leaders put into restrictive status housing because of the threat they pose to the general population will have a more difficult time communicating with other gang members who are in general population if they cannot send them a letter. Anytime offenders are permitted to correspond with each other there is a possibility that messages can get sent to cause harm to other people.

Rowe testified that he was effected by this policy on one occasion. In January 2014, Rowe attempted to write to offender James Roland for what he said were religious reasons. Apparently either Rowe or Roland was in a restrictive status housing unit at the time and the correspondence was prohibited. The proposed correspondence was not introduced into evidence.

### b. Conclusions of Law

Rowe has failed to demonstrate that the offender correspondence policy which prohibits offender-to-offender mail when one prisoner is on restrictive housing status has substantially burdened the exercise of his religion. Even if Rowe was inconvenienced when he was prohibited from communicating with fellow Identity Christian adherent offender James Roland, this inconvenience is not sufficient to create a substantial burden. Rowe may be inconvenienced by his inability to share his faith with all offenders all the time, but he is not substantially burdened by the DOC's policy. The policy simply reduces the pool of offenders with which Rowe can communicate. There is no credible evidence that Rowe is substantially burdened by having to turn his evangelical efforts towards those inmates with whom he is permitted to associate and

communicate. Rowe has failed to meet his burden of persuasion and the DOC is entitled to judgment in its favor on this claim.

## VII. Claim 5: Rowe's Challenge to the Identity Christianity, Handbook of Religious Beliefs and Practices.

Rowe's final claim for relief seeks a personal religious exemption from the DOC's policy prohibiting the use of the swastika as an authorized religious symbol. See DOC's Handbook of Religious Beliefs and Practices. Dkt. 165-5. Rowe asserts that the policy prohibits him from wearing a necklace with a swastika pendent in violation of the Act.

### 1. Findings of Fact

In addition to, or perhaps because of, its association with Nazism, the swastika is a gang symbol used by violent white supremacist organizations. These organizations include the Aryan Brotherhood, Aryan Circle, Saxon Knights, Hammer Skins, KKK, and White Knights. The DOC bans the authorized display of the swastika in an effort to minimize racial and ethnic tensions.

Rowe describes the swastika as a resurrection cross and testified that he would like to use it as a religious symbol of his faith. The Court accepts as credible, Kurt Bensheimer, Deputy Chief, Security Threat Group Operations, DOC, testimony that although the swastika could be used as a religious symbol, in most instances inside the DOC it is used not as a religious symbol, but as a gang symbol. Given its inflammatory nature the swastika is not approved as a religious symbol inside the DOC.

Rowe testified he would like to display a swastika pendant to remind him of God's grace and that he will be resurrected as Christ was. Rowe, however, also acknowledged he is allowed to display his swastika tattoos, and he described no other religious consequence to being prohibited from wearing a swastika necklace. Indeed, he described the DOC's ban on the swastika as not very strict.

### 2. Conclusions of Law

Rowe's inability to wear a necklace with a swastika pendent does not impose a "substantial burden" on Rowe ability to practice Identity Christianity. Rowe's testimony to the contrary is not credible. In addition, Rowe has two swastika tattoos which are plainly visible to anyone who sees him. These unauthorized symbols allow Rowe to fulfill his stated goal of conveying his faith to others. Rowe's argument that there have been no incidents of violence directly attributable to the presence of swastikas or the Aryan Nations standard in prison is not persuasive. This fact reflects that the DOC's policies have been successful in reducing racial and ethnic violence. The Act does not require that the DOC's efforts in this regard be restricted because they are working.

Rowe has failed to meet his burden of proof and the DOC is entitled to judgment in its favor on this claim.

## VIII. Conclusion

For the reasons explained above, Rowe has failed to establish that the challenged policies place a substantial burden on his exercise of religion. However, even if a substantial burden had been shown, Rowe's claims cannot prevail because the burdens created by the policies are in furtherance of a compelling governmental interest and are the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc–1(a)(1)–(2); *Koger*, 523 F.3d at 796. Quite simply, creating a religious exemption for the policies at issue in this case would defy common sense and logic. The result would be that offenders could (by claiming a religious exemption) correspond offender to offender regardless of their restrictive status, receive any publications regardless of their content, create and maintain a limitless library of materials, and wear recognized gang symbols. These results could be catastrophic to the safety and security of the DOC. As previously noted, both the Supreme Court and Seventh Circuit have held that "prison security is a compelling state interest,

and [] deference is due to institutional officials' expertise in this area." *Cutter,* 544 U.S. at 725; *Koger,* 523 F.3d at 800 (quoting *Cutter*, 544 U.S. at 723).

Judgment is entered in favor of the DOC and against Rowe as to all claims brought pursuant to the Religious Land Use and Institutionalized Persons Act. As noted, the Court previously granted summary judgment on Rowe's First Amendment claims and all other claims have been abandoned. See dkt. 131. This Entry resolves all remaining claims against all remaining parties. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**


Date: September 5, 2014

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

All Electronically Registered Counsel

JEFFREY ALLEN ROWE
DOC # 116017
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838